IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
ABERDEEN DIVISION

COURTNEY GREEN                                                                                    PLAINTIFF

V.                                                                    CIVIL ACTION NO. 1:13-CV-00234-SA-DAS

POLYESTER FIBERS, LLC                                                                         DEFENDANT

MEMORANDUM OPINION

Before the Court are seven motions filed by the parties to exclude or limit expert testimony and other evidence.[1] After considering the motions, responses,[2] proffered evidence, and relevant authorities, the Court finds as follows:

*Motions to Exclude Expert Testimony*

Standard of Review

The district court fulfills a gatekeeper function to exclude irrelevant or unreliable expert testimony. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 589 & n. 7, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). This function begins with Rule 702 of the Federal Rules of Evidence, which allows testimony from "a witness qualified as an expert by knowledge, skill, experience, training, or education" if such testimony will assist the trier of fact and "[1] the testimony is based upon sufficient facts or data; [2] the testimony is the product of reliable principles and methods; and [3] the witness has applied the principles and methods reliably to the facts of the case." Under Rule 702, the court should "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of

---

[1] The Court is aware of the outstanding questions regarding its subject matter jurisdiction to hear this case.

[2] Defendant has moved to strike affidavits given by three of Plaintiff's experts, contending that the experts have improperly offered supplemental "opinions" well beyond the expert-designation deadline. Because the Court views these affidavits simply as attempts to rebut assertions made in Defendant's motions to exclude their testimonies, and not as supplemental opinions, the Motion to Strike [153] is DENIED.

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).

Whether a proposed expert should be permitted to testify under Rule 702 "is case, and fact, specific." *Hodges v. Mack Trucks Inc.,* 474 F.3d 188, 194 (5th Cir.2006) (citation omitted). Thus, the district court retains "'broad latitude' both in deciding how to determine whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable." *Id.* (quoting *Kumho Tire Co.,* 526 U.S. at 142, 119 S. Ct. 1167). "The party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." *Mathis v. Exxon Corp.,* 302 F.3d 448, 459–60 (5th Cir. 2002).

The gatekeeper function of the district court does not, however, replace trial on the merits. In performing this function, "the district court should approach its task 'with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'" *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.,* 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chem. Co.,* 826 F.2d 420, 422 (5th Cir.1987)).

<u>Rehabilitation Experts</u>

Both parties seek to exclude the testimony of the other's rehabilitation expert. Plaintiff's expert, Dr. William Burke, proposes to testify about a "life care plan" he developed for Plaintiff, in which Dr. Burke catalogues certain future expenses that will be incurred as a result of Plaintiff's permanent spinal cord injury. Defendant's expert, Kathy Smith, primarily seeks to respond to Dr. Burke's opinion.

Defendant argues that Dr. Burke's life care plan lacks a sufficient medical basis, rendering his opinion unreliable pursuant to Rule 702. Dr. Burke opines that Plaintiff will need persistent medication, yearly exams with various specialists, screenings, medical equipment and supplies, personal homecare, therapy, and assistive technology. But there has been no testimony or record by any physician about Green's *future* medical needs resulting from his spinal cord injury. Rather, the majority of Dr. Burke's recommendations are based upon "current medical daily care" and "treatments and services that have, in fact, been prescribed or recommended by a treating physician" for Plaintiff in the past with regard to his injury.[3]

Defendant has not, however, disputed that Dr. Burke possess extensive qualifications in the field of rehabilitation and disability management. Dr. Burke stated that it is standard within the industry to rely on "a personal interview with the subject of the life care plan" and "a thorough review of the subject's medical records . . . ." He also explained that there is no requirement for a "trained, experienced rehabilitation counselor" to consult with treating physicians or independent medical doctors before formulating the life care plan, especially where, as here, the patient's "medical history and course of medical treatment, post accident, has been thoroughly and clearly documented throughout his medical records" and the patient "has discontinued formal treatment and therapy with his past treating physicians . . . ." In light of Dr. Burke's unquestioned qualifications, and the industry standards to which he avers, the Court finds a sufficient basis for Dr. Burke to testify concerning the life care plan.

To the extent that Defendant seeks to attack the sources or bases of the plan, it will have sufficient opportunity to do so through impeachment and cross-examination. *See Primrose*

---

[3] Dr. Burke identifies four projected expenses based on treatments that have either not been prescribed or that Plaintiff is currently not receiving. These are physical therapeutic evaluations, future orthopedic surgeon consultations, cardiology exams, and psychotherapy. Dr. Burke states that all of these recommendations are clinically indicated by the literature for patients with spinal cord injuries.

*Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (internal quotation and citation omitted) ("[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration."). The request to exclude Dr. Burke's is DENIED.

Defendant's expert, Kathy Smith was similarly designated as an expert in rehabilitation services and disability case management. Her designation states:

> She will respond to the expert opinions offered in designation and at trial by experts retained by the Plaintiff. She may testify regarding Plaintiff Green's current and future needs for care and treatment, along with associated costs. She may also testify as to Plaintiff Green's future labor market access and employability.

Plaintiff argues that Kathy Smith's report does not state a sufficient opinion consistent with this designation for which Plaintiff can prepare his rebuttal or cross-examination, citing *Romero v. Drummond Co., Inc.*, 552 F.3d 1303, 1323 (11th Cir. 2008). But Smith has given a rather detailed opinion attacking the basis of the life care plan developed by Plaintiff's expert, Dr. Burke. In essence, Smith opines that no medical evaluation has been conducted regarding Plaintiff's future medical care, and that Dr. Burke inappropriately made his own medical recommendations.

Smith additionally offers opinions that Plaintiff has reduced employability and life expectancy due to his previous criminal history. In this regard, Plaintiff takes issue with the bases for Smith's opinions, but these objections fall within the purview of the jury. *See Primrose Operating Co.*, 382 F.3d at 562. Accordingly, the Court finds that Smith's report contains sufficient documentation of her opinions. Plaintiff's request to exclude her for an inadequate report is DENIED. As needed and to protect Plaintiff's right to fair notice, Plaintiff may re-urge any objection that Smith's proposed trial testimony goes beyond the parameters of her report.

Plaintiff's Economist

Economist Ronald Missun proposes to testify regarding Plaintiff's lost future earnings. Defendant contends that Dr. Missun's methodology is unreliable and inadmissible for a variety of reasons. Though several of Defendant's arguments possess arguable merit, the Court finds one, relating to the effects of inflation on the award, to be particularly persuasive.

In determining Plaintiff's projected lost future earnings, Dr. Missun utilized the "total offset" method. By this method, Dr. Missun neither included inflation in his projection, nor discounted the projection to present cash value. The approach assumes economically that the inflation rate and the percentage yield that the plaintiff could receive via investment are the same, effectively canceling each other out. *Culver v. Slater Boat Co.*, 722 F.2d 114, 118 (5th Cir. 1983). Courts accepting the total offset theory praise its simplicity. *E.g., Kackowski v. Bolubasz*, 421 A.2d 1027, 1038 (Pa. 1980). Courts rejecting the theory criticize it as being divorced from reality. *E.g., Green v. Gen. Motors Corp.*, 709 A.2d 205, 222 (Super. Ct. N.J. App. Div. 1998).

A review of the relevant authority reveals that Mississippi law does not permit the total offset approach. For example, when applying Mississippi substantive law, the trial court is required to give an instruction, if supported, that an award of lost earnings should be discounted to present cash value. *Jesco, Inc. v. Whitehead*, 451 So. 2d 706, 710 (Miss. 1984). Additionally, the Fifth Circuit, applying federal law in *Culver*, rejected the total offset theory and held that district courts are to use a below-market-discount method, whereby an appropriate present value discount rate must be chosen. 722 F.2d at 121; *see also Lucas v. United States*, 807 F.2d 414, 422 (5th Cir. 1986) ("We have rejected the total-offset approach in cases applying substantive federal law."). The Mississippi Supreme Court has cited *Culver* approvingly and noted that the proper methodology for a lost earnings award under Mississippi law includes a discount to

present cash value. *Rebelwood Apartments RP, LP v. English*, 48 So. 3d 483, 498 (Miss. 2010). Thus, the total-offset method, which eschews such a discount for sake of simplicity, is inconsistent with Mississippi law. Defendant's request to exclude Dr. Missun must, therefore, be GRANTED.

Plaintiff's Treating Physician

Dr. Laurie Nash treated Plaintiff in Fall 2012 at the Shepherd Center in Atlanta, Georgia, where Plaintiff participated in inpatient rehabilitation. At the time of Dr. Nash's deposition, she had not treated Plaintiff for approximately thirty-four months. Defendant has moved to limit her testimony, and has objected to a portion of her video deposition designated for trial, arguing that any opinion offered as to Plaintiff's current treatment needs would be inadmissible. Plaintiff did not respond to Defendant's motion.

Because Dr. Nash has not evaluated Plaintiff for some time, any testimony regarding his current medical needs would not be "rationally based on [her] perception" and could only be admitted as expert testimony. FED. R. EVID. 701, 702. Plaintiff did not, however, identify Dr. Nash as an expert, nor did he provide any expert disclosures as required by Federal Rule of Civil Procedure 26(a)(2). For these reasons, and because Plaintiff has not filed a response,[4] the Defendant's request to exclude Dr. Nash's testimony concerning Plaintiff's current medical needs is GRANTED. In accordance with this ruling, Defendant's separately filed Objection to Dr. Nash's Deposition Testimony [179] is likewise well taken.

Plaintiff's Engineering Expert—Qualifications

Mechanical engineer Dr. Charles Benedict proposes to testify about the general safety at Defendant's Tupelo plant, including the safety of the garnett machine involved in the accident.

---

[4] The District's Local Uniform Civil Rule 7(b)(3)(E) provides that "[i]f a party fails to respond to any motion, other than a dispositive motion, within the time allotted, the court may grant the motion as unopposed."

Defendant objects that Dr. Benedict lacks qualifications to testify regarding "standards, OSHA requirements, the OSHA violations he claims, and his criticisms of the work place practices of the Defendant." Defendant makes three primary contentions in this regard. First, Benedict has neither taken nor taught any OSHA courses and has published no peer reviewed journals on OSHA topics related to machine guarding or control of hazardous energy, such as that of the garnett machine. Second, Benedict has identified no industry standard committee membership related to machine guarding or control of hazardous energy. Third, in discussing OSHA regulations pertaining to the underside of the machine and the machine's garnett lickerin rollers, Benedict mistakenly cited 29 C.F.R. 1910.262(c) and (d) instead of 29 C.F.R. 1910.262(f)(1) and (f)(3).[5]

To support his qualifications as a proposed expert, Dr. Benedict relies on his extensive education and experience in mechanical engineering. He has earned, among other degrees, a Ph.D. in mechanical engineering. He is also a licensed professional engineer in five states and a Board Certified Forensic Examiner. According to Dr. Benedict, he has vast experience with "OSHA and other standards, regulations and requirements" from his time "as an employer, General Contractor, Professional Engineer and as a machine and product design and manufacturing engineer."

In view of the qualifications listed, Dr. Benedict appears to possess a degree of expertise as to some, if not all, of the safety issues connected to his opinions and the facts of this case. Without a complete *voir dire* of Dr. Benedict, the Court is not prepared to grant Defendant's broadly stated request. Thus, Defendant's request to exclude Dr. Benedicts' testimony on safety standards, OSHA requirements, and any violations thereof, is deferred until trial. By separate

---

[5] Defendant also cites multiple cases where Benedict's testimony has been excluded on subjects inapplicable to the present motion. According to Benedict, not cited are the roughly five hundred cases where he has been successfully tendered as an expert.

docket entry, the Court will notice a hearing to determine the admissibility and scope of Dr. Benedict's testimony by way of a pretrial proffer.

Plaintiff's Safety Standards Expert—Qualifications

Franklin Darius has been designated as an expert in "occupational safety and health regulations, compliance . . ., safety-related national consensus standards with respect to working conditions, and safety management systems." Defendant broadly seeks to preclude him from testifying about "machine guarding" in light of an admission by Darius in his deposition testimony that he has no experience in the actual engineering or design of machine guarding.

In support of his qualification to testify, Darius has been a safety consultant and trainer for nearly twenty-five years, is a Certified Occupational Health and Safety Technologist, a Certified Environmental Safety and Health Trainer, and a Certified Safety and Health Official in General Industry and Construction. He has also been an OSHA Training Instructor for thirteen years, teaching courses to safety professionals and OSHA officials on safety standards and OSHA regulations. And specifically, Darius has taught a four-day OSHA course called "Machinery and MachineGuarding," and has presented expert webinars on the topic of machine safeguarding. Though Darius may not be qualified to discuss the engineering and design processes involved in developing machine guarding, the Court finds him to be more than qualified to testify about regulations, standards, and compliance as he proposes to do. Accordingly, Defendant's request to exclude on this basis is DENIED.

Plaintiff's Engineering and Safety Standards Experts—Factual Bases

In addition to contesting Benedict's and Darius' qualifications, Defendant challenges a portion of their proposed testimonies as having no factual basis. In the contested portions, both

experts opine as to the available entry points by which Plaintiff may have passed through the yellow perimeter guard into the garnett machine area. For example, Darius testified:

> [t]here is an opening in the barrier guard on the left side large enough to crawl through. That's a possibility. There is an opening on the right side of the enclosure as well which could possibly be crawled through, that's a possibility. One could step around the end, the discharge end of the Garnett machine at the slat conveyor on either side of the slat conveyor. So there is two more possibilities.

Additionally, Benedict states in his report that the "guarded area appears to be far too small for [Plaintiff] to have used as the ingress area" and "[t]here is no other ingress point into the area where Mr. Green was found except through the gate located immediately to the right of the opening" in the guard. Defendant argues that no evidence exists that Plaintiff traveled through the guard as the experts claim, and that their testimonies are speculative and inadmissible.

It appears to the Court that the experts' opinions about the available entry points were based on their actual inspections of the physical premises, and not merely based on speculation about what may have happened on the day of the accident. Thus, as framed, Defendant's request is DENIED. The Court notes, however, that the line between helpful expert testimony and inadmissible speculation may prove to be narrow, and the Court will enforce the Federal Rules of Evidence in this regard.

*Evidence of Welded Entry Door and Discarded Cable*

The parties next contest the admissibility of evidence that (1) a cable integral to the guard's function was altered, misplaced, or destroyed after the accident, and (2) an entry door on the perimeter guard was welded shut subsequent to the accident. Plaintiff argues that a spoliation instruction is required.

Courts within the Fifth Circuit define spoliation as "the destruction or the significant and meaningful alteration of evidence." *Quantlab Tech. Ltd. (BGI) v. Godlevsky*, No. 4:09-CV-4039-

KPE, 2014 WL 651944, at *8 (S.D. Tex. Feb. 19, 2014) (quoting *Rimkus Consulting Grp., Inc. v. Cammarata*, 688 F. Supp. 2d 598, 612 (S.D. Tex. 2010)). Spoliation requires a showing of "bad faith" on the part of the nonmovant. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003). If Plaintiff succeeds in demonstrating that Defendant acted in bad faith, he may be entitled to an "adverse inference based on the destruction of potential evidence." *Id.* This is commonly imposed through the use of a "spoliation instruction" permitting the "jury to draw an inference that a party who intentionally destroys important [evidence] did so because the contents of [that evidence were] unfavorable to that party." *Russell v. Univ. of Tex. Permian Basin*, 234 F. App'x 195, 207 (5th Cir. 2007) (citing *Vick v. Tex. Emp't Comm'n*, 514 F.2d 734, 737 (5th Cir. 1975)). Plaintiff claims that Defendant intentionally destroyed or altered evidence in two respects.

First, there is generally a cable running the length of the perimeter guard. When someone attempts to open a door to the guard and enter the garnett area, the cable is intended to cause the machine to shut down. Photographs taken shortly after the injury by Robert Hartsoe, Defendant's maintenance director and Rule 30(b)(6) deponent, show a grey cable on the outside of the perimeter guard. But at the time Plaintiff's experts inspected the premises, a different, red cable was in place. According to Hartsoe, someone cut the grey cable after Plaintiff's accident so that the paramedics could gain better access to retrieve Plaintiff from the garnett area. But the grey cable was not produced during discovery, and no explanation has been given for its absence.

Second, it is undisputed that at the time of the accident, there were five operable doors for entry into the garnett machine area as shown by the aforementioned photographs. But within days after the accident, one of the five doors was no longer operable. Plaintiff's proposed expert Dr. Benedict claims that the fifth door was welded shut after the accident and prior to an OSHA

inspection the day after Plaintiff was injured. Defendant disputes the exact timing of the alleged welding, but has not disputed that it occurred.

In light of these changes to the machine area, and to demonstrate "bad faith," Plaintiff cites the following portion from Hartsoe's deposition testimony:

> Q: Now, tell me, if you will, or if you can, what actions y'all took after this accident, other than the Lexan that you and I have talked about a couple of times already, as a result of the accident?
>
> A: To this machine, nothing.
>
> Q: You didn't change any of the guarding?
>
> A: No.

In response to Plaintiff's spoliation motion and in a separate motion *in limine*, Defendant argues that its actions did not constitute bad faith, but were instead subsequent remedial measures. Evidence of subsequent remedial measures, i.e., those "taken that would have made an earlier injury or harm less likely to occur[,]" is not admissible to prove "negligence; culpable conduct; a defect in a product or design; or a need for a warning or instruction." FED. R. EVID. 407. Such evidence may, however, be admissible "for another purpose, such as impeachment or—if disputed—proving ownership, control, or the feasibility of precautionary measures." *Id.*

The alleged destruction or concealment of the cable does not constitute a subsequent remedial measure. While replacing the grey cable with the new red cable may have made the garnett machine safer, disposal of the old, grey cable is a separate act from the remedial measure and may support a spoliation instruction. *See Ashton v. Knight Transp., Inc.*, 772 F. Supp. 2d 772, 802 (N.D. Tex. 2011) (in evaluating spoliation claim, finding the defendant under a duty to preserve faulty tires that had been replaced). On the other hand, the alleged welding of the fifth door could fall within the ambit of Rule 407 if established to be remedial in nature.

11

Thus, in this scenario, a tension between the spoliation doctrine and Rule 407's prohibition of evidence of subsequent remedial measures may arise. *See, e.g., Hickman v. Carnival Corp.*, 2005 WL 3675961, at *1 (S.D. Fla. July 11, 2005). In such cases, the approach endorsed by a leading evidence treatise is to determine whether the alleged conduct that constitutes both destruction or alteration and a remedial measure was "deliberate." David P. Leonard, "The Spoliation Problem and the Subsequent Remedial Measures Rule," The New Wigmore § 2.7. If bad faith conduct is found, the evidence is admissible to prove entitlement to an adverse inference instruction. *Id.* Otherwise, Rule 407 prevails and the measure is excludable to prove fault of the defendant. *Id.*; *see also Allen v. Blanchard*, 763 So. 2d 704, 709 (La. App. 1 Cir. 2000) (finding decision to repair "weld the day following the accident in order to get [the] arena back in working condition" was "entirely reasonable[,]" and spoliation inference was unwarranted).

To make the bad faith determination, Courts have taken two different approaches. *Briggs v. State Farm Fire and Cas. Co.*, No. 3:14-CV-16-DPJ, 2015 WL 1280151, at *2 n.2 (S.D. Miss. Mar. 20, 2015). Some submit the issue of bad faith to the jury. Other courts make the factual determination, and if bad faith is found, instruct the jury regarding the spoliation inference. Here, because the evidence that may demonstrate bad faith is duplicative of and intertwined with potentially inadmissible evidence of subsequent remedial measures, the Court deems it appropriate to make the bad faith determination at the outset, before evidence is presented to the

jury. Thus, by separate docket entry, the Court will notice a hearing at which evidence regarding spoliation will be considered. The spoliation and Rule 407 motions are deferred until that time.[6]

*Criminal History*

Plaintiff requests the Court exclude all evidence of his criminal history. Criminal records attached by Defendant reflect that Plaintiff was (a) charged with shoplifting in 1993, (b) convicted on three counts of aggravated assault in 1994, (c) convicted of robbery in 2003, and (d) indicted on two charges pending at the time of the accident, one for possession of marijuana and one for felony possession of a weapon. At issue is whether these convictions may be used for impeachment and for substantive purposes.

<u>Impeachment by Criminal Conviction</u>

Federal Rule of Evidence 609 sets forth the framework for impeachment by evidence of a criminal conviction. As relevant here, evidence of a felony conviction "must be admitted, subject to Rule 403, in a civil case . . . ." FED. R. EVID. 609(a)(1). But if "more than 10 years have passed" since the later of the "witness's conviction or release from confinement for it," then the evidence will only be admissible if "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect" and if "the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use." FED. R. EVID. 609(b).

With regard to the three charges for which there was no conviction, Rule 609 clearly does not apply, and thus they will not be admissible under this rule. A conviction is required.

---

[6] Defendant objects, more generally, to any other potential evidence of subsequent remedial measures, essentially reciting the contours of Rule 407 as the basis for its request. The determination of whether such measures may be relevant for impeachment or other admissible purposes are best made in the context of trial. Thus, to the extent Defendant seeks a categorical ruling, the request is not well taken. The Court will nonetheless enforce Rule 407 as needed.

As to the conviction for three counts of aggravated assault, Plaintiff was released in 2000, more than ten years ago. Thus, evidence of these crimes will only be admissible if the probative impeachment value "substantially outweighs" the prejudicial effect. *Id.*[7] The Court finds that it does not. The probative impeachment value of the conviction here is lessened, given that the assaults at issue took place over twenty years ago and they are not crimes that inherently implicate dishonesty. The prejudicial value, by contrast, is high. Aggravated assault is a serious offense, and the jury may improperly penalize Plaintiff for his character, which is forbidden by Rule 404(b)(1).

Plaintiff's robbery conviction is evaluated under a different framework. Though he was convicted in 2003, he was released in 2007, and thus Rule 609(b)'s ten year limitation does not apply. FED. R. EVID. 609(b). Rather, the robbery conviction will be admitted unless—pursuant to Rule 403—its probative value is substantially outweighed by the danger of unfair prejudice. FED. R. EVID. 403, 609(a)(1). As the robbery was a more recent offense, the Court finds that its probative impeachment value is greater than that of the assault conviction. The prejudicial effect is also less. Robbery does not implicate the degree of violence as exists for aggravated assault. Accordingly, the Court finds for purposes of Rule 403 that the probative value of evidence of the robbery conviction is not substantially outweighed by the danger of unfair prejudice. It will be admissible in accordance with Rule 609(a)(1). Regarding the precise circumstances surrounding the robbery conviction, the Court will continue to enforce Rule 403.

<u>Criminal History as Relevant Substantive Evidence</u>

Also at issue is whether Plaintiff's criminal history is relevant for substantive purposes. Relevant evidence as defined by the Federal Rules of Evidence is that which "has any tendency

---

[7] The test stated in Rule 609(b) represents the reverse of the general Rule 403 balancing test, under which the Court determines whether the probative value is substantially outweighed by the danger of, among other things, unfair prejudice.

to make a fact more or less probable than it would be without the evidence" if "the fact is of consequence in determining the action." FED. R. EVID. 401. Though, generally speaking, relevant evidence is admissible, Rule 403 vests the Court with discretion to "exclude relevant evidence if its probative value is substantially outweighed by a danger of" among other things "unfair prejudice . . . ." FED. R. EVID. 402, 403. Irrelevant evidence, on the other hand, is never admissible. FED. R. EVID. 402.

The Court finds that Plaintiff's criminal past is relevant to at least two issues to be tried. First, it is relevant to Defendant's claim of workers' compensation immunity, which will hinge on whether Plaintiff was Defendant's employee at the time of the accident. *See* Mem. Op. Mot. Summ. J. [168]. Snelling's staffing manager, Stephanie Hunt, testified that Plaintiff's status as a convicted felon would have made him ineligible for hiring by Defendant as a full time employee. Plaintiff's criminal history is also relevant to lost wages. As evinced in opinions of both tendered economists, a convicted felon is less employable than a non-felon.

Conducting the Rule 403 balancing test with regard to evidence of Plaintiff's robbery conviction, the Court finds that the probative value is not substantially outweighed by the danger of unfair prejudice. As discussed above, the robbery conviction will already be admissible for impeachment purposes. Thus, the prejudicial effect of the jury also hearing the evidence for substantive purposes is lessened. As stated above, however, Rule 403 will be enforced as the circumstances surrounding the robbery become apparent at trial.

On the other hand, the danger of unfair prejudice by admission of the remaining charges and convictions substantially outweighs the probative value. Plaintiff's status as a felon, as relevant to the workers' compensation issue and his work-life expectancy, may be adequately

established by use of the robbery conviction. The balance of Plaintiff's criminal history would be unnecessary and cumulative and could potentially serve as improper character evidence.[8]

Accordingly, Plaintiff's request that his criminal history be excluded is GRANTED IN PART and DENIED IN PART. The robbery conviction may be used for substantive and impeachment purposes, but Plaintiff's remaining criminal history is inadmissible.

*Conclusion*

For the foregoing reasons, the motions to exclude and limit testimony and other evidence are GRANTED IN PART and DENIED IN PART. A separate order to that effect shall issue this day.

SO ORDERED, this the 20th day of October, 2015.

/s/ Sharion Aycock
**UNITED STATES DISTRICT JUDGE**

---

[8] The Court notes that Plaintiff did not admit to his robbery conviction in his deposition testimony or on his employment application with Snelling. To the extent that Defendant seeks to impeach with these alleged prior inconsistent statements, the Court will make a determination in light of Rule 403 at the appropriate time.